(C.D. 4245)

F. W. WOOLWORTH COMPANY *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 19, 1971)

*Sharretts, Paley, Carter & Blauvelt* (*Robert L. Follick* of counsel) for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Peter Jay Baskin*, trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: This protest involves merchandise imported from Italy in 1967 and described on the invoice as "NEW PET BAROMETER ASSORTMENT ALABASTRITE FIGURINES CHANGING COLOR ACCORDING TO WEATHER."

Customs at New York assessed the figurines at 27 per centum ad valorem under TSUS (Tariff Schedules of the United States) item 523.94, as articles of mineral substances, not specially provided for. Plaintiff claims the figurines are properly dutiable at 16 per centum ad valorem under TSUS item 711.55 as hygrometers. In the relevant context of TSUS, the competing tariff items appear as follows:

Classified:

SCHEDULE 5. – NONMETALLIC MINERALS AND PRODUCTS

PART 1. – NONMETALLIC MINERALS AND PRODUCTS, EXCEPT CERAMIC PRODUCTS AND GLASS AND GLASS PRODUCTS

SUBPART K. – NONMETALLIC MINERALS AND PRODUCTS NOT SPECIALLY PROVIDED FOR

Subpart K headnote:
1. This subpart covers mineral substances and articles of mineral substances, not provided for elsewhere in the schedules * * *

* * * * * * *

Mineral substances, and articles of mineral substances, not specially provided for:

| | | |
|---|---|---|
| 523.81 | Mineral substances, crude_____ | * * * |
| | Other: | |
| 523.91 | Not decorated_____ | * * * |
| 523.94 | Decorated _____ | 27% ad val. |

Claimed:

SCHEDULE 7. – SPECIFIED PRODUCTS; MISCELLANEOUS AND NONENUMERATED PRODUCTS

PART 2. – OPTICAL GOODS; SCIENTIFIC AND PROFESSIONAL INSTRUMENTS; WATCHES, CLOCKS, AND TIMING DEVICES; PHOTOGRAPHIC GOODS; MOTION PICTURES; RECORDINGS AND RECORDING MEDIA

SUBPART D. – MEASURING, TESTING, AND CONTROLLING INSTRUMENTS

* * * * * * *

Hydrometers and similar floating in-
struments; thermometers, pyrometers,
barometers, hygrometers, and psychrom-
eters, whether or not recording instru-
ments; any combination of the foregoing
instruments; and articles in which one
or more of such instruments are incor-
porated as significant integral parts and
which are ordinarily used in the home
or office where they are usually hung on
the wall, or placed on mantles, shelves,
or furniture:

\*     \*     \*     \*     \*     \*     \*

Thermometers, pyrometers, barome-
ters, hygrometers, and psychrome-
ters, whether or not recording in-
struments:
   Non-recording instruments:

\*     \*     \*     \*     \*     \*     \*

711.55                Hygrometers and psy-
                 chrometers _____    16% ad val.

The official papers are in evidence. Exhibit 1 (a poodle dog, stand-
ing about 3½ inches high, with a tag around its neck) is a represent-
ative sample of the assorted pet figurines, all imported with similar
tags. On one side the tag bears the following inscription:

Weather

BAROMETER

Statuettes

| Weather | Color |
|---|---|
| Change _____ | Violet |
| Snow _____ | Grey |
| Rain _____ | Pink |
| Fair _____ | Blue |

Made in Italy

On the reverse side the tag is inscribed: "Changes Color as Weather
Changes – Not as effective where steam heated or air conditioned."

Three witnesses testified for plaintiff. Defendant introduced no
evidence.

Mr. Ralph Thomas Sterling, director of import buying and sales
with the F. W. Woolworth Company, testified that he purchased the
imported merchandise; that he put one figurine in his home and one
figurine in his office where, over a period of a year, he observed that
"[w]hen the weather changes, if it's going to rain, it changes a color;
if it's going to snow, the weather gets cold, you have a different color
combination."

On cross-examination, Mr. Sterling testified that he did not know what a hygrometer was and that from his observations he could not state that every time the figurine turned pink it did, in fact, rain. On redirect examination, Mr. Sterling explained that "personally * * * [he] didn't pay that much attention to * * * [the figurine]. * * * that you would have the little tag there, and if it was raining, and pink, you would just check with it to see if [it] was pink * * * [and] every time * * * [he] checked with it the color would jibe with what was on the sheet, under ordinary conditions * * *."

Miss Elsie Petrilla Seeley, an employee of F. W. Woolworth Company, testified that Mr. Sterling gave her one of the animal figurines in the form of a Scotty dog; that she kept it on her kitchen windowsill for "quite a little while", "well over a year", and it indicated the weather exactly as it "was supposed to show it"; that she "very much" observed it and it was "quite accurate". On cross-examination Miss Seeley stated that she did not know what a hygrometer was.

Mr. William J. Schneider testified that he was familiar with exhibit 1, because he had imported "quite a volume of them"; that he "went over * * * [to Italy] and * * * saw them manufactured"; that he observed the figurines change color with changes in the weather as indicated on the tag; that he learned from the factory where they were made that the figurines were treated with a cobalt salt solution and that he had Cleveland Engineering Chemists give him a report on the solution, "what made it tick, and why it did this and that". On cross-examination, Mr. Schneider testified that he didn't know the difference between barometers and hygrometers.

The agreed sole issue posed by the classification under TSUS item 523.94 and the claim under TSUS item 711.55 is whether the imported figurines are or are not hygrometers in the common meaning of the term. Plaintiff contends they are, defendant contends they are not.

The tariff term "hygrometers" is a new tariff classification under TSUS, effective August 31, 1963. (P.L. 87–456, 76 Stat. 72.) Previous tariff acts did not provide for hygrometers by name and administratively hygrometers were accordingly classified:

> * * * under one of the three paragraphs at various rates depending upon the component material of chief value and the type of instrument and its method of operation. Such instruments in chief value of glass * * * [were] classified in paragraph 218(a). Hygrometers based on the expansion and construction of hair * * * [were assessed] under paragraph 372 [apparently under the tariff designation "all other machines, finished or unfinished, not specially provided for"] and other instruments * * * [were assessed] in paragraph 397 [apparently as "articles or wares not specially provided for" composed wholly or in chief value of metal]. * * * [1]

[1] Tariff Classification Study, Schedule 7, page 153.

We have found no judicial precedents, and none are cited in the briefs, on the classification of hygrometers. It would appear, therefore, that under the tariff acts prior to TSUS the trade and commerce did not choose to contest the administrative classifications based, as they were, on considerations other than the common meaning of the term "hygrometers". While the administrative classifications of hygrometers under prior tariff acts offer no assistance on the common meaning of the term, they do point up that there are various types of hygrometers made of various materials which operate differently.

Our task is to determine what, in the common understanding of words, the tariff term "hygrometers" meant at the time the tariff law, in which the term appears, was enacted in 1963. *Davies, Turner & Company* v. *United States*, 39 CCPA 76, C.A.D. 466 (1951). In *Marshall Field & Co.* v. *United States*, 45 CCPA 72, C.A.D. 676 (1958), which reversed this court on the common meaning of the tariff term "artificial fruits", the court of appeals reviewed the province of the court to determine common meaning as follows:

> * * * The court decided the issues, as it has in every other case we have reviewed, *on the basis of its own judgment* as to whether the merchandise before it was or was not *in common understanding* an artificial fruit, leaf or flower. Thus, on a case by case basis, the court construes and sets the limits of the statutory language by a process of inclusion and exclusion. It is by this process that we determine "common meaning," which it is our province to do and as to which we are bound by no evidence. *United States* v. *Felsenthal & Co.*, 16 Ct. Cust. Appls. 15, T.D. 42713; *United States* v. *May Department Stores Co.*, 16 Ct. Cust. Appls. 353, T.D. 43090; *United States* v. *North American Mercantile Co.*, 17 C.C.P.A. (Customs) 378, T.D. 43820; *United States* v. *H. A. Caesar & Co.*, 18 C.C.P.A. (Customs) 106, T.D. 44067; *California Fruit Wrapping Mills (Inc.)* v. *United States*, 19 C.C.P.A. (Customs) 381, 385; *Hummel Chemical Co.* v. *United States*, 29 C.C.P.A. (Customs) 178, C.A.D. 189; and see also *American Bead Co.* v. *United States*, 7 Ct. Cust. Appls. 18, 21, T.D. 36259, and decisions of the United States Supreme Court there cited. [Emphasis quoted.]

> It will be seen from the cases above mentioned that many different factors were taken into consideration in determining whether the articles in each case were artificial fruits or flowers. These factors were not limited to the two questions of closeness of simulation and suitability to the ornamental uses of real flowers referred to in the *Cochran* opinion [10 Ct. Cust Appls. 62 (1920), T.D. 38336] but included others such as size, primary function, other recognized names, uses and applicable tariff act provisions, and ordinary common sense. The situation must be viewed as a whole.

> The tariff laws are drafted in the language of commerce which is presumptively that in common use and no testimony as to common meaning is required to make out a case because such testi-

mony, if offered, is merely advisory to the court. *Hummel Chemical Co.* v. *United States, supra.* We have before us samples of the merchandise which, in a case of this character, are most potent witnesses, *United States* v. *The Halle Bros. Co.*, 20 C.C.P.A. (Customs) 219, T.D. 45995; *United States* v. *Fred Gretsch Mfg. Co., Inc.*, 28 C.C.P.A. (Customs) 26, C.A.D. 120. [45 CCPA, pages 80, 81.]

When searching the common meaning of a tariff term, the court may consult lexicons, and when the tariff term relates to a technical field the common meaning is best determined in that context. *Brown Boveri Corp. et al.* v. *United States*, 53 CCPA 19, 23, C.A.D. 870 (1966).

Both sides cite the following general dictionary definitions of the word "hygrometer", relevant to the meaning of the tariff term in 1963:

*Webster's New International Dictionary, Second Edition, Unabridged* (1955), page 1223:

hygrometer – An instrument or apparatus for measuring the degree of moisture of the atmosphere.

*Funk & Wagnalls New Standard Dictionary of the English Language* (1937), page 1206:

hygrometer – Any form of apparatus for measuring the humidity of the atmosphere.

*The Oxford Universal Dictionary* (1955), page 941:

hygrometer – An instrument for measuring the humidity of the air.

Defendant additionally cites the following definition:

*Webster's Third New International Dictionary* (1963):

hygrometer – any of several instruments for measuring the humidity of the atmosphere—see DEW-POINT HYGROMETER, HAIR HYGROMETER, PSYCHROMETER.

Stressing the word "measure" in the above definitions, defendant asserts that since "[n]one of * * * [the] testimony establishes that the imported merchandise *measures the amount of humidity in the atmosphere* [emphasis copied], * * * it has not been shown that such merchandise falls within the common understanding of the word 'hygrometer'." More broadly, defendant contends that the definitions and testimony demonstrate that the imported merchandise "is not a hygrometer in any form" under the rule, relied on by plaintiff, that an *eo nomine* provision without limitation includes all forms of the named article. *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935). (Defendant's brief, page 7.) If the term "hygrometer" is limited to those instruments which literally give a *reading* in connection with the *amount* of moisture in the air, which is

defendant's point, then defendant is, indeed, correct. There is no proof that the imported figurines do that. However, we would observe, as the court of appeals has in similar situations, *Brown Boveri Corp.* v. *United States, supra,* that the tariff terms "thermometers", "pyrometers", "barometers", "hygrometers", and "psychrometers" are technical terms and "that common nomenclature is employed in various useful arts which is not always adequately reflected in dictionaries for general use." *United States* v. *The Spiegel Bros. Corp.,* 51 CCPA 69, 73, C.A.D. 839 (1964). Again paraphrasing what the court of appeals so aptly stated in *The Spiegel Bros.,* "[w]e do not presume ever to have known just what the term meant to those conversant" [at page 74] with the term "hygrometers" in 1963. This case makes necessary that we find out.

Because this is a case of first impression, analyzing a technical term we know nothing about, we resist superficial determination of what the term "hygrometer" is commonly understood to mean merely on the basis of general dictionary definitions. Upon consideration of the more precise sources conversant with the field to which hygrometers relate, we conclude that the common meaning of the term "hygrometers" is not limited to hygrometers which literally measure or give a reading in connection with the amount of moisture in the air, but is broad enough to include those instruments of a class which merely show changes in the humidity, i.e. "whether the weather is likely to be good or bad" (Explanatory Notes to the Brussels Nomenclature, 1955, Vol. III, heading 90.23 at page 1072), commonly known as "hygroscopes".

The dictionary definitions of the word "hygrometers" cited by both sides, while definitely accurate of a class of instruments, obviously do not attempt to identify all of the "several instruments" commonly understood to be within the class, or how those instruments measure the humidity of the atmosphere. More precise sources uniformly indicate that a hygrometer is:

> * * * an instrument for measuring the absolute or relative amount of moisture or humidity in the atmosphere. *When the instrument is used only to determine changes in the humidity it is termed a "hygroscope."* * * * [Emphasis added, Jones, Engineering Encyclopedia, The Industrial Press, page 675–H (1954).] [2]

> * * * an instrument used to measure absolute or relative water content of air. The most common types are the psychrometer, the hair hygrometer, * * * and the dew-point hygrometer * * *. There are also absorption hygrometers, diffusion hygrometers, optical hygrometers and other types. [The International Dictionary of Physics and Electronics, Van Nostrand Company, Inc., page 432 (1956).]

---

[2] See also, The Encyclopedia Americana, Vol. 14, page 594 (1953).

Instruments for measuring the absolute or relative humidity are generally known as hygrometers. In by far the majority of cases the gas involved is air. The earlier hygrometers depended upon the contraction and expansion of materials such as hair or catgut when exposed to diminishing moisture. *The familiar weatherhouse with two doors through which a man or woman appears, according to the expectation of wet or fine weather,*[3] *works on this principle, a catgut thread being used in the base.* Present-day methods, which vary widely in accuracy and utility are * * *

\*    \*    \*    \*    \*    \*    \*

[Chemical Hygroscopic, Psychrometric, Dew-point, and Miscellaneous methods such as thermal conductivity, cobalt salt indicator, diffusion, etc.]

### CHEMICAL METHOD

This operates on the principle of absorption by some chemical of all the water vapor in a known volume of the gas-vapor mixture. Since a considerable volume of gas must be used to secure an accurately measurable weight increase of the absorbent, the method does not lend itself to rapid sampling, and with rapidly varying humidities it is worthless. Nevertheless, if used carefully, it is the most accurate means of measuring humidity and is well fitted to be an absolute standard, giving results believed to be accurate to less than 0.1%. It involves passing a measured volume of air over a drying agent such as phosphorus pentoxide, the drying bulb being weighed before and after the experiment. The increase in weight divided by the weight of air passed through gives the absolute humidity H.

### HYGROSCOPIC METHODS

These depend upon the change in length of a moisture-sensitive element with change in its moisture content as it comes to equilibrium with the moisture in the surrounding gas. The change in length acts through a link motion on a pointer moving over a suitably calibrated scale. The better instruments usually utilize a length of hair, or band of hair, which has approximately a straight-line response over the middle portion of the relative-humidity scale. While portable and easy to use, the response of the hair to changes in relative humidity is slow and absolute readings cannot be relied upon because of a drift in the "zero" which takes place as the hairs take a permanent set. While creep and time lag are drawbacks, acceptable results can be obtained if frequent checks and adjustments are made before use, according to Mueller (12), who checked thirty-two different types of hair hygrometers. Under the most favorable conditions, accuracy about as good as for the wet-bulb method can be obtained.

### DEW-POINT METHOD

Next to the chemical method, this is perhaps the most accurate method of determining humidity. The temperature at which

---

[3] Knights, American Mechanical Dictionary, Vol. 11, p. 1158 (1876), describes an early "hygrometer, or *weather prophet*," of the same sort.

moisture from a sample of gas will condense on a mirror surface, alternately heated and cooled, is measured. A dew-point instrument in a moving air stream may be seriously in error unless the mirror-surface temperature rather than the cooling-fluid temperature is measured; otherwise the instrument tends to read low. Accuracy also depends upon how elaborate the instrument is, what precautions are taken to prevent radiation effects from the observer, etc.

Several commercial instruments are available, and photoelectric systems have also been devised for elimination of human error and conversion to continuously recording instruments.

### Miscellaneous Methods

From time to time methods of humidity determination which depend upon special properties of the gas-water vapor mixture, and can only be used under certain special conditions, have been described. The thermal conductivity of air varies with its humidity, and it has been shown that a hygrometer of considerable accuracy over certain humidity ranges can be constructed on this principle.

*One of the most novel hygrometers makes use of paper impregnated with cobaltous chloride, which is blue at low and pale red at high humidities.* It is claimed that with care relative humidity can be measured, using this paper, to within 2% in the 40–70% relative humidity range, and to within 5% outside this range (16). [Emphasis added.]

Difference in the diffusion rates of water vapor and air has also been utilized as a basis for hygrometer construction (8), while sensing elements, whose electrical conductivity changes as their moisture content increases or decreases in equilibrium with the gas, have also been suggested, particularly for control instrumentation (9). [Encyclopedia of Chemical Technology, The Interscience Encyclopedia, Inc., New York, Volume 7 (1951), pages 550, 554, 555.]

The Condensed Chemical Dictionary, Reinhold Publishing Corporation, 5th ed., 1956, "a reference volume for all requiring quick access to essential data regarding chemicals and other substances used in manufacturing and research, * * * " at pp. 289, 291, confirms that cobalt used chemically to derive cobalt salts as "cobaltous bromide", "cobaltous chloride" and "cobaltous iodite" is used in hygrometers. Thorpe's Dictionary of Applied Chemistry, 4th ed., Vol. III (1939), discusses salts of cobalt in the context of change in color as follows at page 221:

This change in colour has also been used for preparing "floral hydrometers" [sic] by tinting artificial flowers which in damp weather remain pink but in dry weather turn violet or blue.

The classifications in part 2 of TSUS schedule 7 covering "Optical Goods; Scientific and Professional Instruments; Watches, Clocks, and Timing Devices; Photographic Goods; Motion Pictures; Record-

ings and Recording Media" are substantially of the same order as the classifications in chapter 90 of the so-called Brussels Nomenclature [4] covering "optical, photographic, cinematographic, measuring, checking, precision, medical and surgical instruments and apparatus; clocks and watches; musical instruments, sound recorders and reproducers; * * *." The "Brussels Nomenclature" was one of the classification systems which exerted the greatest influence on the arrangement of TSUS.[5] No one can gainsay that the "wide variety of instruments and apparatus * * * [covered in TSUS schedule 7, part 2 and Brussels Nomenclature, Chapter 90] are, as a rule, characterized by their high finish and high precision." [6]

The imported figurines are not high precision type measuring instruments. That they need not be is supported by the conversant sources we have cited and by the Brussels Nomenclature note that "[t]here are certain exceptions to the general rule that the instruments and apparatus falling within * * * Chapter [90] are high precision types" and that the chapter includes "fancy hygroscopes, irrespective of their accuracy (heading 90.23)." [7]

Brussels heading 90.23 classifies hygrometers and psychrometers *eo nomine* as does TSUS item 711.55. The Brussels note on hygrometers states that:

> Fancy hygroscopes consisting essentially of more or less decorative objects (chalets, towers, etc.) with figurines coming in or going out, according to whether the weather is likely to be good or bad, are also classified here. *On the other hand, papers impregnated with chemical substances, the colour of which varies according to the moisture content of the atmosphere are excluded* (Chapter 48).[8] [Emphasis added.]

The Brussels exception of "papers impregnated with chemical substances, the colour of which varies according to the moisture content of the atmosphere" from classification as hygrometers falls within the rule that the exception of a particular thing from a statute shows that in the opinion of the lawmaker the thing excepted would be within the statute had not the exception been made. *Pulaski Co. et al.* (Five Per Cent Cases) v. *United States*, 6 Ct. Cust. Appls. 291, T.D. 35508 (1915). Brussels does not exclude other "impregnated" articles "the colour of which varies according to the moisture content of the atmosphere." It appears, therefore, that to those conversant with the term in the field to which hygrometers relate and to those concerned with that classifying term, an accurate reading of the humidity in the

[4] Nomenclature for the Classification of Goods in Customs Tariffs, 1955.

[5] Tariff Classification Study, Submitting Report, page 8.

[6] Explanatory Notes to the Brussels Nomenclature, Vol. III, Chapter 90, p. 1017.

[7] See note 6, at page 1018.

[8] See note 6, at page 1072.

atmosphere is not determinative of whether a particular instrument is a hygrometer, and that instruments and articles incorporating materials impregnated with chemical substances, the color of which changes to reflect changes in the weather, are commonly understood to be "hygrometers". We so hold.

While it may seem incongruous to think of the imported figurines as "instruments", which is how TSUS characterizes the hydrometers, thermometers, pyrometers, barometers, hygrometers and psychrometers it classifies, the word "instruments", as near as we can find, has never been construed as a word of limitation. Cf. *United States* v. *Loffredo Bros. et al.*, 46 CCPA 63, C.A.D. 697 (1958). There is no legislative history relevant to the scope of the *eo nomine* term hygrometers. We see no reason to limit the *eo nomine* term simply because it is classed with articles *eo nomine* provided for which, as a rule, are characterized as instruments.

The imported figurines having been shown to change color according to the moisture content of the atmosphere are of a class commonly known as hygrometers. The protest claim under TSUS item 711.55 is sustained.

Judgment will be entered accordingly.